**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

JANE DOE #15,

     Plaintiff,                                CASE NO.: _____

v.

BACKPAGE.COM, LLC, CARL FERRER,
BEST WESTERN INTERNATIONAL, INC.
AND W.P. INVESTMENTS, LLC

     Defendants.

## PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff JANE DOE #15, (herein "Jane Doe") sues Defendants BACKPAGE.COM, LLC AND CARL FERRER (collectively the "Backpage Defendants" herein), BEST WESTERN INTERNATIONAL, INC. AND W.P. INVESTMENTS, LLC (collectively "Best Western" herein), and alleges:

### I.     SUMMARY

1.     Sex trafficking has hit epidemic proportions in our communities, and it has had a devastating effect on the victims and a crushing financial effect on our world.

2.     Sex trafficking presents a public health crisis.

3.     Those facilitating sex trafficking should be held accountable.

4.     It should not be our tax dollars, charities, and churches that carry the burden of the catastrophic harms and losses to sex trafficking survivors.

5.     That responsibility should fall to the individuals and businesses like the defendants in this case that have facilitated and profited from sex trafficking.

6.     While Best Western and Backpage profited, untold multitudes of victims were repeatedly raped and abused.

7.      These victims have been left with lifelong physical, emotional, and mental injuries.

8.      Jane Doe is but one of those victims—or rather—survivors.

9.      No longer will businesses profit off of the exploitation and mistreatment of others.

10.     Best Western, Backpage, and other nefarious enablers must take responsibility for their actions. That time is now.

## II.      JURISDICTION & VENUE

11.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Act and the Trafficking Victims Protection Reauthorization Act ("TVPA" herein), 18 U.S.C. § 1581, *et seq.*

12.     Since they form part of the same case or controversy as her federal claims, the Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)-(c) because Defendant W.P. Investment LLC's principal place of business is in Dallas County, Texas, and Jane Doe was trafficked and suffered injury in Dallas County, Texas.

## III.      PARTIES

### A.      Plaintiff Jane Doe

14.     Jane Doe #15 ("Jane Doe") is an individual over the age of eighteen (18) and resides in Texas.

15.     Jane Doe is a "victim" as sex trafficking as that term is defined under the TVPA and is therefore protected under the applicable provisions of the TVPA.

16.     Jane Doe prosecutes this action under a pseudonym name for good cause.

17.     For example, identification of Jane Doe may create a risk of retaliatory physical or mental harm. Anonymity of Jane Doe is also necessary to protect privacy for the sensitive and highly personal matters as they relate to Jane Doe. Jane Doe's need for anonymity

outweighs the prejudice, if any, to opposing parties. Jane Doe's need for anonymity outweighs the public's interest in knowing her identity.

**B.     The Backpage Defendants**

18.     Defendant Backpage.com, LLC ("Backpage") is a Delaware Limited Liability Corporation with its principal place of business in Texas.

19.     At all times material hereto, Backpage was authorized to and was doing business in the State of Texas.

20.     Backpage may be served through its attorney of record, **Mark Castillo, 901 Main Street, Suite 6515, Dallas, Texas 75202.**

21.     Defendant Carl Ferrer is a natural person and is a resident of Texas.

22.     Ferrer may be served through his attorney of record, **Mark Castillo, 901 Main Street, Suite 6515, Dallas, Texas 75202.**

23.     Backpage and Carl Ferrer will collectively be referred to hereinafter as the "Backpage Defendants" or "Backpage" herein.

**C.     Best Western**

24.     Best Western International, Inc. is a for-profit Arizona corporation incorporation with its principal place of business in Phoenix, Arizona. At all relevant times, Best Western International, Inc. owned, operated, and controlled the Best Western located at 2075 N. State Highway 360, Grand Prairie, Texas, 75050. Best Western International, Inc. is duly authorized to conduct business in Texas, conducts substantial business in Texas, and maintains a registered agent and principal office in Texas. Best Western International, Inc. may be served with process by serving its registered agent, **Prentice Hall Corporation System at 211 E. 7th Street, Suite 620, Austin, Texas 78701**.

25.     W.P. Investments, LLC is a for-profit Texas corporation with its principal place of business in Grand Prairie, Texas. At all relevant times, Best Western International, Inc. owned, operated, and controlled the Best Western located at 2075 N. State Highway 360, Grand Prairie, Texas, 75050 . W.P. Investments, LLC may be served with process by serving its registered agent, **Kalpesh Dahya at 2075 N. Highway 360, Grand Prairie, Texas, 75050.**

26.     Best Western International, Inc. and W.P. Investments, LLC are collectecively referred to as Best Western herein.

27.     At all material times, Best Western owned, operated, and controlled the Best Western located at 2075 N. State Highway 360, Grand Prairie, Texas, 75050.

### IV.    FACTUAL ALLEGATIONS REGARDING THE BACKPAGE DEFENDANTS

**A.     Backpage caused the exponential growth of sex trafficking in the United States.**

28.     According to the United States Department of Homeland Security, human trafficking and the sexual exploitation of these victims generates billions of dollars each year in illegal proceeds, making it more profitable than any transnational crime except drug trafficking.

29.     While precise data concerning the black-market trade is scarce, it is estimated that there were as many as 27 million victims of human trafficking in 2013—including 4.5 million people trapped in sexual exploitation.

30.     In 2014, the National Center for Missing and Exploited Children reported an 846% increase from 2010 to 2015 in reports of suspected child sex trafficking—an increase the organization found to be "directly correlated to the increased use of the internet to sell children for sex." With the help of online advertising, traffickers can maximize profits, evade law enforcement detection, and maintain control of victims by transporting them quickly between locations.

31.     Online advertising has transformed the commercial sex trade. Sex trafficking used to only take place on the streets, in casinos, at truck stops, and in other physical locations—that is no longer the case. Now, most child sex trafficking occurs initially online.

32.     According to the United States Senate Permanent Subcommittee on Homeland Security and Government Affairs, Backpage is involved in 73% of all child trafficking reports that the National Center for Missing and Exploited Children receives from the general public (excluding reports by Backpage itself).

33.     Prior to its shutdown, the Backpage website was the leading online marketplace for human trafficking.

34.     The National Association of Attorneys General has aptly described the Backpage website as a "hub" of "human trafficking, especially the trafficking of minors."

35.     The Backpage Defendants do not deny their site is used for criminal activity, including the sale of children for sex. As found by the United States Subcommittee Report, internal company documents show Backpage's continued acknowledgment of sex trafficking and other illegal activities occurring on their site.

36.     The investigation into Backpage by the United States government resulted in wide sweeping changes. On April 6, 2018, President Trump signed into law the Stop Enabling Sex-Trafficking Act (SESTA), S. 1693 – 115th Congress.

37.     In enacting SESTA, the Senate found that Backpage "knowingly concealed evidence of criminality by systematically editing its 'adult ads' that [it] actually knew facilitated prostitution and child sex trafficking."

38.     The same day as SESTA was enacted, the FBI seized the Backpage website, and arrested its founders and owners:



39.     Backpage was not only a forum for abuse—it was an active participant.

**B.      The Backpage Defendants' knowingly sanitized adult ads to allow for the sex trafficking of vulnerable individuals.**

40.     The Backpage Defendants actively participated in the trafficking and exploitation of vulnerable individuals through systematically editing its adult ads to conceal their true nature—ads to sell sex.

41.     More specifically, Backpage altered ads prior to publication by deleting words, phrases, and images indicative of child and other sex trafficking.

42.     Backpage also "educated" its users on how to make illegal ads for prostitution and trafficking appear to be legal ads for escorts. Backpage has illegally sanitized its site and "educated" its users for nearly a decade.

43.     Originally, in 2008, Backpage began discreetly instructing moderators (who screened ads) to edit the text of adult ads to conceal the true nature of the underlying transaction.

44.    Initially, when a user attempted to post an ad with a forbidden word, the user would receive an error message identifying the problematic word choice to "help" the user, as Backpage CEO Carl Ferrer put it.

45.    For example, a user advertising sex with a "teen" would get the error message "sorry, teen is a banned term." By simply redrafting the ad, the user would be permitted to post a sanitized version.

46.    Backpage later employed a similarly helpful error message in its "age verification" process of adult ads. In October 2011, Ferrer directed his technology consultant to create an error message when a user supplied an age under 18 years.

47.    For example, a message would appear informing the trafficker that "Oops! Sorry, the ad poster must be over 18 years of age." With a quick adjustment to the poster's age, the ad would post despite the fact that the advertisement was still that for the sexual exploitation and sexual assault of a minor.

48.    In December 2009, the Backpage Defendants prepared a training session for their team of moderators on the sanitization process. Through the use of a PowerPoint presentation, moderators were taught that "terms and code words indicating illegal activities require removal of ad or words".

49.    Moderators were also informed that the adult moderation pre-posting review queue would be fully implemented by January 1, 2010.

50.    Backpage later concluded that the error message method of sanitization alone was no longer efficient. So, instead of relying on their customers to fix ads, Backpage decided to formalize the sanitization process by creating an automated deletion system—"Strip Term from

Ad Filter." Backpage programmed its electronic filter to delete hundreds of words indicative of sex trafficking from ads before their publication.

51.     The Backpage Defendants did not just discuss ways to make the sanitization process more effective, but actively engaged in updating the word bank of terms to make the adult section appear "cleaner than ever."

52.     For example, in a December 1, 2010, email addressed to Backpage moderators, Padilla, Backpage COO, stated:

> Between everyone's manual moderations, both in the queue and on the site, and the Strip Term from Ad Filters, things are cleaner than ever in the Adult section.
> …
> In an effort to strengthen the filters even more and avoid the repetitive task of manually removing the same phrases every day, every moderator starts making a list of phrases you manually remove on a regular basis?
> …
> Included in your lists should be popular misspellings of previously banned terms that are still slipping by.
> …
> To avoid unnecessary duplicates, I'm attaching a spreadsheet with the most current list of coded terms set to be stripped out.

53.     The spreadsheet attached to Padilla's email indicates that the following words (among others) were automatically deleted from adult ads by the Strip Term from Ad Filter before ads were published:

- Lolita (and its misspelled variant, lollita)[1]
- Teenage
- Rape
- Young

54.     Moreover, multiple documents and communications from the Backpage Defendants demonstrate the inclusion of these and other terms in the "Strip Term from Ad Filter".

---

[1] In a November 17, 2011 email, Ferrer told Padilla that the word "Lolita" is code for under aged girl.

Over the course of the next several months, Backpage added additional words to the" Strip Term from Ad Filter", including:

- Amber Alert[2]
- Daddy[3]
- Little girl
- Teen
- Fresh
- Innocent
- School girl

55.     For ads submitted to the section advertising escorts for hire, the filter deleted words describing every imaginable sex act. Backpage's filter also deleted common terms of the trade:

- Full Service
- Pay 2 Play
- No limits
- The Erotic Review or TER (a prominent online review site for prostitution)

56.     Backpage's filter edited obvious prostitution price lists by deleting any time increments less than an hour (e.g. $50 for 15 minutes).

57.     When a user submitted an adult ad containing one of the above forbidden words, the Backpage Defendants' "Strip Term from Ad Filter" would immediately delete the discrete word and the remainder of the ad would be published after moderator review.

---

[2]In a June 7, 2011 email, Ferrer told a Texas law enforcement official that a word found in one Backpage ad amber alert is "either a horrible marketing ploy or **some kind of bizarre new code word for an under aged person**." Ferrer told the Texas official that he would forbid the phrase (not remove the advertisements)—without explaining that, inside the Backpage Defendants' operations, this meant the word would be automatically deleted from advertisements to conceal their true nature. Ferrer forwarded this email chain to Padilla and instructed Backpage employees to add "amber alert" to the automatic strip out filter. A June 11, 2012 version of the filter word list indicated that "amber alert" was indeed automatically deleted by the Strip Term from Ad Filter.

[3] In February 2011, CNN ran a story about a 13-year-old girl named Selena who was sold for sex on Backpage. The report noted that "suspect ads with taglines such as 'Daddy's Little Girl' are common" on the Backpage website. Ferrer's remedy instead of removing this content from Backpage was to email the CNN story to Padilla and instruct him to add "daddy" and "little girl" to the strip out filter.

58.     Of course, the "Strip Term from Ad Filter" changed nothing about the real age of the person being sold for sex or the real nature of the advertised transaction. Nor was it Backpage's goal to do so.

59.     By July 2010, the Backpage Defendants were praising moderation staff for their editing efforts. An agenda was circulated for a July 2010 meeting of the Backpage Defendants' Phoenix staff and applauded moderators for their work on "adult content" and encouraging Backpage staff to keep up the good work.

60.     By August of 2010, Backpage had a staff of 20 moderators working 24/7 to remove any sex act pictures and other code words indicating sex for money.

61.     On September 4, 2010, when Craigslist, the company's chief competitor, shut down its entire adult section, the Backpage Defendants recognized it was "an opportunity" and "[a]lso a time when we need to make sure our content is not illegal due to expected public scrutiny."

62.     The Backpage Defendants initially responded by expanding the list of forbidden terms that could trigger the complete deletion of an entire ad—whether by operation of an automated filter or by moderators. Despite finally taking a step in the right direction, the Backpage Defendants soon began to recognize that the deletion of ads with illegal content was bad for business.

63.      This methodical and calculated decision made by the Backpage Defendants to focus all of its efforts on sanitizing instead of removing advertisements of human trafficking was done solely for the Backpage Defendants' own financial gain and with complete disregard for the safety of victims, including Jane Doe.

64.     By late 2010, profits were increasing and Backpage was manually or automatically editing 70% to 80% of all adult ads.

65.     Internal emails, as well as the Senate Subcommittee Report, consistently demonstrate that Backpage Defendants and Backpage employees knew the adult section ads were for prostitution and that the moderators knowingly sanitized the ads.

66.     An example of Backpage's knowing facilitation is that Backpage locked the account of "Urban Pimp" for posting numerous ads for sex. When his ads were temporarily blocked, Urban Pimp complained to the Backpage Defendants that his advertisements for sex were blocked and that he was trying to post advertisements for sex in 50 cities all across the United States.

67.     Rather than report Urban Pimp to law enforcement or ban Urban Pimp from Backpage, Urban Pimp was advised that he had unlocked his account and that if his account did not work "email me back direct".

68.     For example, in an email exchange dated July 11, 2013, Vaught, a Backpage supervisor, instructed a moderator that she "probably would not have reported" the advertisement despite the fact that the woman in the ad looked drugged, underage, and had bruises. In chastising the moderator for her decision, Vaught noted that "these are the kind of reports the cops question us about" and that while she finds ads "like this" (with clear signs of abuse and trafficking) she does not typically send them to the National Center for Missing and Exploited Children.

69.     Documents from the Backpage Defendants indicate that the company permitted moderators to delete only a de minimis share of adult ads in their entirety. In January 2011, Ferrer estimated that about five adult ads were removed out of every 1,000—which equates to less than one percent of advertisements that promote prostitution, as well as human trafficking, being removed from Backpage by the Backpage Defendants.

70.     This low removal rate of advertisements promoting human trafficking was by design. For example, on October 24, 2010, Padilla emailed the supervisor of Backpage's contract moderators to inform her of the edit over delete policy. The email subject line read "your crew can edit" and went:

> [Your team] should stop Failing ads and begin editing … as long as your crew is editing and not removing the ad entirely, we shouldn't' upset too many users. Your crew has permission to edit out text violations and images and then approve the ad.

71.     In editing advertisements that clearly advertised sexual exploitation and human trafficking, moderators were instructed by the Backpage Defendants to systematically remove words indicative of criminality before publishing an ad (assuming that the ad still appeared criminal after making it through the Strip Word Filter).

72.     As stated by Backpage Employee A in the Senate Subcommittee Report who worked as a Backpage moderator from 2009 through 2015, the moderator's goal was to remove key phrases that made the ad sound like a prostitute ad rather than an escort ad, dancing around the legality of the ad. Backpage Employee A explained the Backpage Defendants wanted everyone to use the term "escort," even though the individuals placing the ads were clearly prostitutes. Therefore, the Backpage Defendants were systematically through both explicit and convert means helping its users turn an intended illegal advertisement for human trafficking into a seemingly legal escort advertisement—all while concealing the users' true intent.

73.     Testimony under oath by former Backpage moderator Adam Padilla, brother of Backpage executive Andrew Padilla, corroborates Backpage Employee A's account.

74.     In an August 2, 2016 deposition, Adam Padilla testified that deleting ads for illegal conduct, rather than editing out the indicia of illegality to provide a façade of legality, would have cut into company profits:

> A: [I]t would be pretty much common knowledge that it's still going to run.  So a person is still going to … do what they wanted to do, regardless.
>
> Q: And do you agree with me if you removed language from an ad that blatantly sells—or says that "I'm willing to have sex with you for money," and then you post the remainder, you know as the person who edited the ad, that the ad is someone who is trying to sell sex for money, correct?
>
> A: Yes.[205]

> A:  [M]y responsibility was to make the ads okay to run live on the site, because having to get rid of the ad altogether was bad for business. And so you would want to, you know, make it — take out any of the bad stuff in the ad so that it could still run….
>
> Q:  When you say that you viewed your job responsibility to be to take out the bad stuff in ads, you're referring to what we discussed earlier with regard to images that suggested that the ad was advertising money for sex or content that suggested the ad was for an advertisement for money for sex, correct?
>
> A:  That is exactly correct.[203]

75.     Not only did the Backpage Defendants prevent moderators from deleting advertisements, but the Backpage Defendants moderators themselves used Backpage for prostitution services.

76.     For example, Backpage Employee C explained that at least one of her coworkers contacted and visited prostitutes using Backpage ads and told his colleagues about the encounters.

77.     Similarly, Backpage Employee A related that some Backpage moderators visited massage parlors that advertised on Backpage. Given the clear company policy and corporate culture of Backpage, those employees who felt that the corporate policy to encourage and assist users to disguise their human trafficking ads were wrong did not voice their concerns out of fear for retaliation.

78.     Although the Backpage Defendants' role in facilitating human trafficking was apparent to its employees, company management reprimanded employees who memorialized this in writing.

79.     On October 8, 2010, Padilla and a Backpage moderator made that point clear by ordering moderators not to leave notes in user accounts, even those who are long time term-of-use violators. Specifically, Padilla states in the October 8, 2010 email:

> Backpage and you in particular, cannot determine if any user on the site in [sic] involved with prostitution. Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. There was not one mention of prostitution in the power point presentation. That was a presentation designed to create a standard for what images are allowed and not allowed on the site. If you need a definition of "prostitution" get a dictionary. Backpage and you are in no position to re-define it.
>
> This isn't open for discussion. If you don't' agree with what I'm saying completely, you need to find another job.

80.     In January 2013, a moderator copied similar notes into an email to a supervisor: "Could not delete ad. An escort ad suggested that they don't want a non GFE so I am assuming they are promote [sic] prostitution".

81.     After an apparent telephone conversation, the moderator wrote the supervisor to "apologize" saying that she had to remove the offending picture and "didn't want to lose the notes."

The supervisor suggested that the moderator communicate in Gchat while another supervisor stressed via email that the moderator follow the protocol and not go into detailed explanation.

82.     These practices have continued as recently as August 2016, when Backpage moderation supervisor Vaught requested that contract moderators not use the phrase promoting sex, but should instead say "adult ad."

83.     Despite these admonitions to moderators by the Backpage Defendants, as well as their executives and supervisors, the language of adult ads (both edited and unedited) leave little doubt that the underlying transactions involve human trafficking as well as the sexual assault and sexual exploitation of trafficking victims.

84.     For example, in a March 2016 internal email, Backpage moderator supervisors were reminded that the following terms were being wrongfully removed from ads, including: PSE (Porn Star Experience), Porn Star, Full Pleasure, Full Satisfaction, Full Hour, Quickie (even with a price accompanying the term) and GFE—which stands for girlfriend experience—a code word for prostitution.

85.     As explained in an October 10, 2010 Backpage internal email from Padilla to Backpage moderators regarding Backpage's sanitation of adult ads: "it's the language in the ads that is really killing us with the Attorneys General." Similarly, Ferrer explained the need for a special "Clean Up" of Backpage's adult section in advance of a day on which he expected the "Attorney General investigators to be browsing for escorts."

86.     These behind the scenes companywide policies were not intended to reach the public. On July 28, 2011, Backpage co-founder Larkin cautioned Backpage CEO Ferrer against publicizing the Backpage Defendants' moderation practices, explaining that "we need to stay away from the very idea of editing the posts, as you know."

87.     Backpage had good reason to conceal its editing practices: those practices served to sanitize the content of innumerable advertisements for illegal transactions, including trafficking Jane Doe—even as the Backpage Defendants represented to the public and the courts that it merely hosted content others had created.[4]

88.     Backpage had good reason to conceal its editing practices: those practices served to sanitize the content of innumerable advertisements for illegal transactions, including trafficking Jane Doe—even as the Backpage Defendants represented to the public and the courts that it merely hosted content others had created.[5]

89.     Backpage did not implement these sanitation processes on an ad hoc basis but in a systematic manner that demonstrated a clear company policy to help human traffickers avoid law enforcement detection and continue their wholesale sexual assault of individuals, including Jane Doe and other young women.

**C.     Jane Doe was trafficked as a result of being posted on Backpage.**

90.     Backpage's lawless and morally corrupt environment makes the Backpage Defendants responsible for the natural consequences stemming from that environment—the sex trafficking of Jane Doe.

91.     Jane Doe was one of Backpage's human sex trafficking victims.

92.     Jane Doe was sexually exploited through the Backpage website.

---

[4] For example, in Defendant Ferrer's Plea Agreement, he admitted that the "great majority of these advertisements are, in fact, advertisements for prostitution services"; a transcript from *R.O., et al. v. Medalist Holdings, Inc. et al.*, Washington Superior Court noted and sanctioned the conduct of Backpage – including that of Larkin – for wasting judicial resources and causing delay to what were "clearly valid claims or rights being asserted by" trafficking victims); and the US District Court Northern District of Illinois Order sanctioning backpage for lying about their actions not being illegal and facilitating criminal conduct ("But the misrepresentations by Backpage go not only to the extent to which the Backpage adult services site served as a medium for unlawful solicitation of criminal conduct but also as to elements such as causation and irreparable harm, which the court of appeals considered and resolved in Backpage.com's favor.").

[5] *Id.*

93.     Jane Doe was sexually exploited through Backpage in 2009 and 2010.

94.     Backpage created a forum for Jane Doe's exploiters to easily post advertisements of her on Backpage.

95.     Jane Doe's trafficker took advantage of what Backpage had to offer him as a one of their "customers". Jane Doe's trafficker posted advertisements of her without her permission.

96.     Multiple men responded to these Backpage ads wherein they met Jane Doe at hotels to exchange sexual acts for money. Upon meeting these men, Jane Doe experienced repeated sexual assault and sustained life changing injuries.

97.     Backpage allowed the posting of ads for trafficking victims in Texas, including Grand Prairie and the DFW area, where Jane Doe was trafficked and abused.

98.     Backpage profited from the posting of ads in Texas.

99.     Backpage profited from the posting of ads for Jane Doe in Texas.

## V.     FACTUAL ALLEGATIONS REGARDING BEST WESTERN

**A.     Human trafficking and the sexual exploitation of trafficking victims is a rampant, well-known problem in the hotel industry.**

100.    Traffickers have long capitalized on the hotel industry's refusal to adopt companywide anti-trafficking policies, refusal to train staff on what to look for and how to respond, and failure to establish a safe and secure reporting mechanism, and they have exploited the seclusion and privacy of hotel rooms.

101.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[6]

---

[6] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (last viewed November 25, 2019) citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.

102.    Human trafficking is estimated to generate $150 billion per year in profits.[7]

103.    For years, sex trafficking ventures have brazenly and openly operated out of hotels throughout this country, and those trafficking ventures have "been able to reap these profits with little risk when attempting to operate within hotels."[8]

104.    In 2018 alone, 3,218 individual victims of human trafficking reached out to the Polaris Project's National Human Trafficking Hotline.[9]

105.    Since 2007, the National Hotline has handled 51,919 calls, accounting for a total 23,078 victims identified.[10]

106.    Attorneys for the hotel industry estimate that eight out of ten arrests for human trafficking occur in or around hotels.[11]

107.    In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[12]

108.    Hotels have been found to account for over 90% of commercial exploitation of children.[13]

---

[7] Bradley Myles, Combating Human Trafficking in the Hotel Industry, Huffington Post, July 22, 2015, at https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 (last viewed November 25, 2019); See Galucci, , supra.

[8] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry (last viewed November 25, 2019); see also Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post, June 2016, at http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victims-life_us_57714091e4b0f168323a1ed7 (last viewed November 25, 2019).

[9] 2018 Statistics from the National Human Trafficking Hotline, Polaris Project, 2018, at https://polarisproject.org/sites/default/files/Polaris_National_Hotline_2018_Statistics_Fact_Sheet.pdf (last viewed November 25, 2019).

[10] Id.

[11] Rich Keating, Human Trafficking: What is it and how it impacts the Hotel Industry, AHIA Sprint Conference 2013, available at http://ahiaattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last viewed November 25, 2019).

[12] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hotel Industry, Cornell Hotel Report, October 2015, at https://scholarship.sha.cornell.edu/cgi/vi ewcontent.cgi?article=1222&context=chrpubs Oct. 2015 (last viewed November 25, 2019).

[13] See Erika R. George and Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

109.    Room rentals drive the profits of hotels, not other amenities such as food and drink purchases, spa services, restaurants and other in-room entertainment services.[14]

110.    At limited service hotels and extended stay hotels, room rentals alone account for 97% of the total revenue of the hotel and the average ratio of full service, and room rentals at limited service hotels accounts for 68% of total revenue.[15]

111.    According to the Polaris Project, one of the most commonly reported venues for sex trafficking to the National Human Trafficking Hotline is hotels and motels.

112.    It has long been recognized that exploiters and traffickers use hotel and motel rooms when setting up "dates" between victims of sex trafficking and those individuals purchasing sex.

113.    As stated in a publication by Cornell University on the issue, "the hospitality industry is undoubtedly involved in the sex trafficking industry … and therefore have an inherent responsibility to deter the crime and can be liable for failing to do so."

114.    According to a 2012 BEST study, 63% of trafficking incidents happen in hotels, ranging from luxury to economy, with the majority of victims being children.

115.    The ease of access and anonymity of hotels has led to an explosion in child sexual exploitation nationwide.

116.    Several industry leaders and municipalities, including the City of Baltimore and the State of Connecticut, now require mandatory training on how to recognize and respond to the signs of human trafficking and the sexual exploitation of trafficking victims.

117.    The United States Department of Homeland Security established the Blue Campaign to end human trafficking.[16]

---

[14] Robert Mandelbaum, Rooms Department Operations, Hospitality Net, Mar. 23, 2007, available at https://www.hospitalitynet.org/opinion/4030758.html (last viewed November 25, 2019).
[15] *Id.*
[16] https://www.dhs.gov/blue-campaign (last viewed December 20, 2019).

118.    In a recent Blue Campaign bulletin, the Department of Homeland Security outlines that traffickers have long used the hotel industry as a hotbed for human trafficking.

119.    The recent Blue Campaign bulletin recommends policies and procedures that the industry can implement to help prevent human trafficking and the sexual exploitation.

120.    Some of the recommended policies and procedures include learning to identify warning signs and indicators of human trafficking.

121.    Warning signs identified in the recent Blue Campaign bulletin include, but are not limited to:

      a.    patrons paying for a room with cash or a pre-paid credit card;

      b.    other guests lingering outside a hotel room for long periods of time;

      c.    non-guests coming and going from the premises;

      d.    patrons other than hotel guests paying for hotel rooms;

      e.    minors paying or attempting to pay for hotel rooms; and

      f.    traffickers using other victim's identities to book rooms.

122.    These recommended policies and procedures are intended to reduce human trafficking.

123.    Best Western knew or should have known of these recommended policies and procedures.

124.    At all material times, Best Western maintained control over the operation of Best Western located at 2075 N. State Highway 360, Grand Prairie, Texas, 75050.

125.    Best Western's hotel located at 2075 N. State Highway 360, Grand Prairie, Texas, 75050 was branded as a Best Western Hotel.

126.    Guests of Best Western expect consistency among hotel locations.

127.    Guests of Best Western are told to be certain that each Best Western branded hotel complies with standards of Best Western.

128.    Best Western had actual authority over the operation of Best Western's hotel, 2075 N. State Highway 360, Grand Prairie, Texas, 75050.

129.    Best Western had apparent authority over the operation of Best Western's hotel, located at 2075 N. State Highway 360, Grand Prairie, Texas, 75050.

130.    Best Western exercised its actual and apparent authority to control the day-to-day operations at Best Western, located at 2075 N. State Highway 360, Grand Prairie, Texas, 75050.;

131.    Best Western is liable for the acts of its franchisees when it exerts day-to-day control over its franchisees.

132.    Best Western is liable for the acts of its franchisees if guests believe that it controls the operation of its franchisees.

133.    Best Western is a quality brand.[17]

134.    Best Western strives for consistency among its franchisee's hotels.

135.    Best Western implements policies for its franchisees to meet certain standards.

136.    Best Western implements procedures for its franchisees to adhere to consistent standards.

137.    Best Western exercises control over its franchisees to ensure quality control.

138.    Best Western exercises control over decisions related to payment options for rooms, including but not limited to allowing payment by cash or pre-paid credit card.

139.    Best Western exercises control over policies regarding guests lingering in hallways.

---

[17] https://www.bestwestern.com/en_US/about/press-media/best-western-overview.html (last accessed January 31, 2020).

140.     Best Western exercises control over security, including but not limited to decisions related to security guards, lighting, and other security measures.

141.     Best Western exercises control over training of hotel employees.

142.     Best Western exercises an ongoing right of control over its hotels, including but not limited to Best Western hotel, located at 2075 N. State Highway 360, Grand Prairie, Texas, 75050, through one or more of the following actions:

    a.   hosting online bookings on Best Western's domain;

    b.   requiring Best Western branded hotels to use Best Western's customer rewards program;[18]

    c.   setting employee wages;

    d.   making employment decisions;

    e.   advertising for employment;

    f.   sharing profits;

    g.   standardized training methods for employees;

    h.   building and maintaining the facility in a specified manner;

    i.   standardized or strict rules of operation;

    j.   regular inspection of the facility and operation;

    k.   fixing prices; and/or

    l.   other actions that deprive Best Western's branded hotels of independence in their business operations.

**B.     Jane doe was trafficked at Best Western's hotel.**

143.     From 2009 through 2010, Jane Doe was trafficked at a Best Western Inn, located at 2075 N. State Highway 360, Grand Prairie, Texas, 75050.

---

[18] https://www.bestwestern.com/en_US/best-western-rewards.html (last accessed January 31, 2020).

144. Jane Doe's trafficker worked alongside Best Western employees to coordinate the trafficking of Jane Doe and others at the Best Western.

145. In addition to Jane Doe, Jane Doe's trafficker also trafficked several others, including minors, at the Best Western.

146. These other victims were responsible for securing a room at the Best Western.

147. Initially, Best Western refused to allow the group to secure a room on its property due to the recognition that criminal activity may be taking place.

148. Nevertheless, after additional attempts, Best Western ultimately allowed the group to stay on their property.

149. Although Best Western had knowledge, it refused to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent the sexual exploitation of trafficking victims at their properties.

150. This failure lead to Jane Doe's continued sexual exploitation and sexual assault while Best Western turned a blind eye to the plague of human trafficking and the sexual exploitation of trafficking victims at their location.

151. Human trafficking is a crime under federal law.

152. Human trafficking is a crime under Texas law.

153. Jane Doe's traffickers committed a federal crime by trafficking Jane Doe.

154. Jane Doe's traffickers committed a Texas crime by trafficking Jane Doe.

155. Hotels should not allow illegal activity on their premises.

156. Hotels should take reasonable steps to prevent human trafficking on their premises.

157.    There is no reason a hotel should tolerate any known human trafficking on its premises.

158.    A reasonably prudent hotel trains its employees to recognize signs of human trafficking.

159.    A reasonably prudent hotel trains its employees to report signs of human trafficking.

160.    A reasonably prudent hotel implements policies to prevent human trafficking.

161.    Best Western complies with hotel industry recommended practices.

162.    Best Western recognizes the need to combat human trafficking occurring at hotels.[19]

163.    The people who worked there knew or should have known that Jane Doe was staying at their property and recognized unusual and suspect conduct surrounding her stay.

164.    More specifically, upon information and belief, the following signs of human trafficking were readily present at Best Western's hotel:

     a.   Excessive single male traffic by non-patrons entering and exiting the hotel;

     b.   Increased male foot traffic and lingering non-patrons lined in hallways;

     c.   Patrons paying for rooms with cash or pre-paid cards;

     d.   Patrons other than hotel guests paying for hotel rooms;

     e.   Minors paying or attempting to pay for hotel rooms;

     f.   Traffickers using victims' identities to book rooms;

     g.   Declining room service for extended periods of time;

     h.   High volume of used condoms left in room; and

---

[19] *See, e.g.* https://www.bestwestern.com/en_US/about/press-media/best-western-human-rights-policy.html (last accessed January 31, 2020).

i.   Other signs of sex trafficking.

165.   Nevertheless, Best Western continued to accept financial payment for her stay all while doing nothing to prevent or stop criminal activity-sex trafficking, including the trafficking of Jane Doe-from occurring on their property.

166.   At Best Western's premises, Jane Doe was repeatedly and brutally sexually assaulted.

## VI.   CAUSES OF ACTION AGAINST THE BACKPAGE DEFENDANTS

### A.   FIRST CAUSE OF ACTION—TVPA

167.   Jane Doe incorporates all other allegations, including the factual allegations outlined above in Section IV.

168.   At all relevant times, Jane Doe was and is a victim within the meaning of 18 U.S.C. § 1595(a).

169.   At all relevant times,  the Backpage Defendants were and are a perpetrator within the meaning of 18 U.S.C. § 1595(a).

170.   The Backpage Defendants benefitted, by receiving financial and other compensation, through its participation in a venture involving the trafficking, harboring, and maintenance of human trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

171.   The Backpage Defendants knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of human trafficking victims in exchange for financial benefits, in violation of the TVPA, 18 U.S.C. § 1581, et seq.

172.   The Backpage Defendants' TVPA violations were a direct, producing, and proximate cause of the injuries and damages to Jane Doe.

B.     SECOND CAUSE OF ACTION— TEXAS CIVIL PRACTICES AND REMEDIES CODE CHAPTER 98

173.    Jane Doe incorporates all other allegations.

174.    The Backpage Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

175.    The Backpage Defendants had a duty not to knowingly benefit, directly or indirectly, from a pattern of criminal activity, including but not limited to the trafficking of persons, such as Jane Doe.

176.    At all relevant times, The Backpage Defendants breached this duty by knowingly participating in the facilitation of trafficking victims, including Jane Doe, by acts and omissions including, but not limited to:

  a.  Accepting advertising fees from the Backpage website from human traffickers, including Jane Doe's trafficker, despite actual and/or constructive knowledge that those advertisements were for illegal human trafficking, prostitution, and/or sexual exploitation of trafficking victims;

  b.  Designing and implementing the Strip Term from Ad Filter to automatically sanitize advertisements intended to promote human trafficking, prostitution, and/or the sexual exploitation of trafficking victims in an effort to maximize advertising revenue, customer satisfaction, and avoid law enforcement detection of illegal acts;

  c.  Designing and implementing, in order to maximize revenue, a manual moderation system intended to sanitize posted content advertising human trafficking, prostitution, and/or the sexual exploitation of trafficking victims to give those ads the appearance of promoting legal escort services as opposed to illegal services;

  d.  Implementing a corporate policy to maximize revenue of sanitizing advertisements promoting human trafficking, prostitution, and/or sexual exploitation of trafficking victims instead of removing those advertisements from the Backpage website or reporting those advertisements to the proper law enforcement officers;

  e.  Knowingly implementing a corporate policy in order to maximize profit from the adult section of the Backpage website that discouraged moderators and employees of Backpage from contacting the authorities and/or advocacy groups when

advertisements on the Backpage website clearly promoted human trafficking, prostitution, and/or sexual exploitation of trafficking victims;

f.   Knowingly refusing to pull down advertisements (after Backpage had internally sanitized the ad either manually or with the use of the Strip Term from Ad Filter) that clearly demonstrated trafficking victims were being exploited and trafficked for sex; and

g.   Knowingly refusing to pull down advertisements after reports and/or complaints that the advertisement was being used to exploit a trafficking victims.

177.   The Backpage Defendants received substantial financial benefits as a result of the posting of illegal ads for prostitution on its website.

178.   The Backpage Defendants received substantial financial benefits as a result of human trafficking on its website.

179.   The Backpage Defendants received a direct financial benefit from the posting of illegal ads that led to the sexual exploitation of Jane Doe.

180.   As described throughout this petition and above, the Backpage Defendants received substantial financial benefits as a result of these acts and/or omissions. Moreover, the Backpage Defendants received a direct financial benefit of the advertising fee paid by Jane Doe's trafficker on the Backpage website, sexually exploiting Jane Doe. These acts, omissions, and/or commissions were the producing, but for, and proximate cause of Jane Doe's injuries and damages. Therefore, the Backpage Defendants are in violation of Texas Civil Practice and Remedies Code § 98.002.

C.   THIRD CAUSE OF ACTION—NEGLIGENCE

181.   Jane Doe incorporates all other allegations.

182.   The Backpage Defendants had a duty of care to operate the Backpage website in a manner that did not sexually exploit individuals, including Jane Doe.

183.    Moreover, the Backpage Defendants had a duty of care to take reasonable steps to protect the foreseeable victims of the danger created by their online marketplace for prostitution and sex trafficking, and their actions in perpetuating that marketplace by helping sex traffickers sanitize ads to avoid law enforcement detection and post their ads.

184.    The Backpage Defendants breached the foregoing duties because they knew, or should have known, that sex traffickers were using their website to post advertisements of trafficking victims for sex, including such advertisements of Jane Doe.

185.    Despite this knowledge, the Backpage Defendants failed to take reasonable steps to protect vulnerable victims being trafficked or exploited, including Jane Doe.

186.    The Backpage Defendants failed to exercise ordinary care as would a reasonably prudent person under the same circumstances.

187.    Jane Doe's sexual exploitation was a foreseeable result of Backpage's development of an online sex trafficking community.

188.    As a direct and proximate result of the Backpage Defendants' wrongful acts and omissions, Jane Doe suffered, and continues to suffer, severe injuries and damages.

189.    Each of the Backpage Defendants' negligent acts and omissions, singularly or collectively, constituted negligence and proximately caused legal injuries to Jane Doe.

**D.    FOURTH CAUSE OF ACTION—NEGLIGENCE PER SE**

190.    Jane Doe incorporates all other allegations.

191.    The Backpage Defendants' acts and omissions violated various provisions of federal law, including the TVPA.

192.    The Backpage Defendants' acts and omissions violated various provisions of Texas law, including but not limited to Texas Civil Practice and Remedies Code Chapter 98.

193.    The Backpage Defendants' failure to comply with the standard of care set forth in these laws constitutes negligence per se.

194.    Each of the Backpage Defendants' negligent acts and omissions, singularly or collectively, constituted negligence per se and proximately caused legal injuries to Jane Doe.

E.    FIFTH CAUSE OF ACTION—NEGLIGENT UNDERTAKING

195.    Jane Doe incorporates each foregoing allegation.

196.    The Backpage Defendants undertook to perform services that it knew or should have known were necessary for the Jane Doe's protection; the Backpage Defendants failed to exercise reasonable care in performing those services; and the Backpage Defendants' conduct increased the plaintiff's risk of harm.

197.    More specifically, the Backpage Defendants undertook efforts to combat the human trafficking and other illegal activities, including but not limited to the trafficking and sexual exploitation of trafficking victims including Jane Doe, that it *knew* were regularly occurring on its website:

> Backpage prohibits illegal content and activity on its website and takes numerous steps to prevent such misuse, especially to guard against any human trafficking or child exploitation. Backpage has voluntarily employed extensive monitoring to identify improper content, including automated filtering and manual review. It also reports suspect ads to the National Center for Missing and Exploited Children ("NCMEC"), and regularly works with local, state and federal law enforcement to support investigations and prosecutions. These actions include promptly responding to subpoenas, providing training to law enforcement, removing and blocking posts at their request, and even conducting independent research to assist in rescuing victims and the arrest and prosecution of criminals.[20]

---

[20] *See* Brief of Backpage in Response to Motion to Dismiss, BACKPAGE.COM, LLC, Plaintiff, v. Loretta E. LYNCH, in her Official Capacity as Attorney General of the United States of America, Defendant., 2016 WL 1575713 (D.D.C.).

198.     The efforts identified by the Backpage Defendants are the types that give rise to a duty. There is a duty to exercise reasonable care to avoid a foreseeable risk of injury to others. Here, the Backpage Defendants clearly foresaw the risk of Backpage harming innocent persons, including but limited to trafficking victims like Jane Doe. Likewise, the Backpage Defendants undertook steps to minimize such risks. Texas law provides for a duty to exercise reasonable care in performing services for another that the individual should recognize as necessary for the protection of a third party. Having recognized the risk to trafficking victims, such as Jane Doe, the Backpage Defendants undertook a duty to protect against the trafficking of persons, including Jane Doe.

## F.     SIXTH CAUSE OF ACTION—CIVIL CONSPIRACY[21]

199.     Jane Doe incorporates each foregoing allegation.

200.     Each of the Backpage Defendants entered into a civil conspiracy with one another, Jane Doe's trafficker(s), those who responded to the ads on Backpage.com, and others that ultimately assaulted Jane Doe. The acts of this conspiracy clearly demonstrate that the result was to accomplish an unlawful purpose by unlawful means, including, but not limited to, promoting prostitution and promoting and assisting human traffickers in promoting sexual exploitation of trafficking victims, including Jane Doe, and sexually exploiting Jane Doe. The Backpage Defendants had a meeting of the minds with their co-conspirators on the object of the conspiracy—sexually exploiting Jane Doe—and its course of action, and at least one or more of the conspirators, as alleged herein, committed at least one or more unlawful, over acts to further the object or course of action of the conspiracy.

---

[21] While civil conspiracy has sometimes been labeled a "derivitave tort" in Texas, Jane Doe is pleading it as a separate cause of action out of abundance of caution.

201.    Jane Doe suffered injury and damages as a direct and proximate result of the wrongful act. The civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts, and omissions alleged, were a direct, producing, and proximate cause of the injuries and damages to Jane Doe. The civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts, and omissions alleged, were moreover a substantial factor in bringing about the injury and damages to Jane Doe. Without such civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts, and omissions alleged, the injury and damages would not have occurred. Moreover, a person of ordinary intelligence in the Backpage Defendants' position would have foreseen that the damages alleged herein might result from the civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts, and omissions alleged.

202.    As co-conspirators, the Backpage Defendants are jointly and severally with one another responsible for the injuries and damages suffered by Jane Doe.

203.    As a direct and proximate result of the Backpage Defendants' wrongful acts and omissions, Jane Doe was trafficked and injured. Jane Doe suffered, and continues to suffer, severe injuries and damages.

G.    SEVENTH CAUSE OF ACTION—GROSS NEGLIGENCE

204.    Jane Doe incorporates all other allegations.

205.    The Backpage Defendants' acts and omissions constitute gross neglect.

206.    Viewed objectively from the standpoint of the Backpage Defendants at the time of the incidents, the Backpage Defendants' acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Jane Doe.

207.    The Backpage Defendants nevertheless evidenced conscious indifference to the rights, safety, or welfare of others, including Jane Doe.

208.    As a result of the Backpage Defendants' gross neglect, Jane Doe was exposed to and did sustain serious and grievous personal injury.

209.    Each of the Backpage Defendants' negligent acts and omissions, singularly or collectively, constituted gross negligence and proximately caused legal injuries to Jane Doe.

210.    Exemplary damages are warranted for the Backpage Defendants' gross negligence.

## VII.    CAUSES OF ACTION AGAINST BEST WESTERN

### A.    FIRST CAUSE OF ACTION—TVPA

211.    Jane Doe incorporates all other allegations, including the factual allegations outlined above in Section IV.

212.    At all relevant times, Jane Doe was and is a victim within the meaning of 18 U.S.C. § 1595(a).

213.    At all relevant times,  Best Western were and are a perpetrator within the meaning of 18 U.S.C. § 1595(a).

214.    Best Western benefitted, by receiving financial and other compensation, through its participation in a venture involving the trafficking, harboring, and maintenance of human trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

215.    Best Western knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of human trafficking victims in exchange for financial benefits, in violation of the TVPA, 18 U.S.C. § 1581, et seq.

216.    Best Western's TVPA violations were a direct, producing, and proximate cause of the injuries and damages to Jane Doe.

### B.    SECOND CAUSE OF ACTION— TEXAS CIVIL PRACTICES AND REMEDIES CODE CHAPTER 98

217.    Jane Doe incorporates all other allegations.

218.   Best Western's acts, omissions, and commissions, taken separately and/or together, outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

219.   Best Western had a duty not to knowingly benefit, directly or indirectly, from a pattern of criminal activity, including but not limited to the trafficking of persons, such as Jane Doe.

220.   At all relevant times, Best Western breached this duty by knowingly participating in the facilitation of trafficking victims, including Jane Doe, by acts and omissions including, but not limited to:

     a)    Profiting from renting rooms to those looking to sexually exploit Jane Doe;

     b)    Increasing profit margins due to lower operation costs by refusing to implement proper training;

     c)    Increasing profit margins due to lower operation costs by refusing to install proper security device;

     d)    Increasing profit margins due to lower operation costs by refusing to install adequate lighting and security cameras;

     e)    Increasing profit margins due to lower operation costs by refusing to hire qualified security officers;

     f)    Increasing profit margins as a result of continued customer loyalty by traffickers who sought to sexually exploit trafficking victims;

     g)    Benefiting by avoiding law enforcement officials and/or spending the time to address, report, and properly solve human trafficking and the sexual exploitation of trafficking victims on Best Western's premises;

     h)    Benefiting by avoiding criminal liability by corporations and/or employees who failed to report sexual exploitation—which is a violation of Texas law;

     i)    Increasing profit margins and benefitting by knowingly catering to the needs of a criminal sub-culture that is looking for locations that will not actively enforce laws against human trafficking and the sexual exploitation of trafficking victims or take active security measures to prevent human trafficking and the sexual exploitation of trafficking victims on their property.

221.    Best Western received a direct financial benefit of the hotel rental fees paid by Jane Doe's trafficker and johns, who sexually exploited Jane Doe.

222.    As described throughout this petition and above, Best Western received substantial financial benefits as a result of these acts and/or omissions. These acts, omissions, and/or commissions were the producing, but for, and proximate cause of Jane Doe's injuries and damages. Therefore, Best Western is in violation of Texas Civil Practice and Remedies Code § 98.002.

C.    THIRD CAUSE OF ACTION—NEGLIGENCE

223.    Jane Doe incorporates all other allegations.

224.    Best Western had a duty of care to operate each of their hotels in a manner that did not endanger trafficking victims.

225.    Best Western had a duty of care to take reasonable steps to protect the foreseeable victims of the danger created by their acts and omissions

226.    Such foreseeable risks include the trafficking and sexual exploitation of trafficking victims due to Best Western fostering an environment that encouraged this behavior.

227.    Despite this knowledge, Best Western failed to take reasonable steps to protect vulnerable victims being trafficked or exploited.

228.    Best Western failed to exercise ordinary care as would a reasonably prudent person under the same circumstances.

229.    Best Western had a duty to the general public and to persons being trafficked at its hotel, including Jane Doe, to take reasonable steps to protect them from the foreseeable dangers of human trafficking.

230.    Best Western breached the foregoing duties because they knew, or should have known, that adults working as sex traffickers were causing by any means trafficking victims,

34

including Jane Doe, to be sexually exploited and trafficked at Best Western' properties on a repeated basis.

231.   Best Western was also negligent in one or more of the following, non-exclusive particulars:

a)   Renting rooms to those looking to sexually exploit Jane Doe;

b)   Failing to implement proper training of Best Western's employees and managers regarding the signs of human trafficking and the sexual exploitation of trafficking victims;

c)   Failing to install proper security devices in the Best Western's lobby, hallways, and parking lots that would help (a) deter human trafficking and the sexual exploitation of trafficking victims and (b) be used to identify potential human trafficking and the sexual exploitation of trafficking victims and alert the proper authorities and/or intervene in an appropriate way;

d)   Failing to install adequate lighting and security cameras to monitor ingress and egress of human traffickers and suspicious males looking to sexually exploit trafficking victims on Best Western's property;

e)   Failing to hire qualified security officers who would actively combat human trafficking and the sexual exploitation of trafficking victims ;

f)   Failing to implement proper security measures to prevent the sexual exploitation of trafficking victims at Best Western's properties;

g)   Encouraging and benefitting from continued customer loyalty by traffickers who sought to sexually exploit trafficking victims , including Jane Doe, due to Best Western's lack of measures against the sexual exploitation of trafficking victims and human trafficking. This customer loyalty lead to continued sales;

h)   Avoiding law enforcement officials and/or spending the time to address, report, and properly solve human trafficking and the sexual exploitation of trafficking victims on Best Western's premises; and

i)   Avoiding criminal liability by corporations and/or employees who failed to report sexual exploitation—which is a violation of Texas law.

232.   As a direct and proximate result of the Best Western's wrongful acts and omissions, Jane Doe suffered, and continues to suffer, severe injuries and damages.

233.   Each of Best Western's negligent acts and omissions, singularly or collectively, constituted negligence and proximately caused legal injuries to Jane Doe.

**D.     FOURTH CAUSE OF ACTION—NEGLIGENCE PER SE**

234.   Jane Doe incorporates all other allegations.

235.   Best Western's acts and omissions violated various provisions of federal law, including the TVPA.

236.   Best Western's acts and omissions violated various provisions of Texas law, including but not limited to Texas Civil Practice and Remedies Code Chapter 98.

237.   Best Western's failure to comply with the standard of care set forth in these laws constitutes negligence per se.

238.   Each of Best Western's negligent acts and omissions, singularly or collectively, constituted negligence per se and proximately caused legal injuries to Jane Doe.

**E.     FIFTH CAUSE OF ACTION—NEGLIGENT UNDERTAKING**

239.   Jane Doe incorporates each foregoing allegation.

240.   Best Western undertook to perform services that it knew or should have known were necessary for the Jane Doe's protection; Best Western failed to exercise reasonable care in performing those services; and Best Western's conduct increased the plaintiff's risk of harm.

241.   More specifically, Best Western undertook efforts to combat the human trafficking and other illegal activities, including but not limited to the trafficking and sexual exploitation of trafficking victims including Jane Doe, that it *knew* were regularly, as demonstrated by the following statement:[22]

---

[22] https://www.wfaa.com/article/news/local/woman-who-says-she-was-sex-trafficked-at-age-of-4-sues-hotel-chains/287-f1464a43-fdc2-40d2-b609-8b3b80f0d53c (last accessed January 29, 2020).

36

> *"Best Western International, Inc condemns human trafficking. It is a despicable crime and the criminals who intentionally inflict this suffering on their victims should be prosecuted to the fullest extent of the law.*
> *Best Western supports the industry's efforts to raise awareness and fight against this inhumane and horrific crime. While Best Western branded hotels are independently owned and operated, we require that each member hotel complies with all laws and treats all hotel guests consistent with our core values of integrity, honesty, and respect for others' dignity.*
> *"We provide information and training resources to member hotels on this serious issue, such that hotels can educate their staff about how to recognize and report instances of trafficking."*

242.    The efforts identified by Best Western are the types that give rise to a duty. There is a duty to exercise reasonable care to avoid a foreseeable risk of injury to others. Here, Best Western clearly foresaw the risk of Backpage harming innocent persons, including but limited to trafficking victims like Jane Doe. Likewise, Best Western undertook steps to minimize such risks. Texas law provides for a duty to exercise reasonable care in performing services for another that the individual should recognize as necessary for the protection of a third party. Having recognized the risk to trafficking victims, such as Jane Doe, Best Western undertook a duty to protect against the trafficking of persons, including Jane Doe.

### F.    SIXTH CAUSE OF ACTION—CIVIL CONSPIRACY[23]

243.    Jane Doe incorporates each foregoing allegation.

244.    Each of the Best Western defendants entered into a civil conspiracy with one another, Jane Doe's trafficker(s), those who responded to the ads on Backpage.com, and others that ultimately assaulted Jane Doe. The acts of this conspiracy clearly demonstrate that the result was to accomplish an unlawful purpose by unlawful means, including, but not limited to, promoting prostitution and promoting and assisting human traffickers in promoting sexual exploitation of trafficking victims, including Jane Doe, and sexually exploiting Jane Doe. Best Western had a meeting of the minds with their co-conspirators on the object of the conspiracy—sexually

---

[23] While civil conspiracy has sometimes been labeled a "derivitave tort" in Texas, Jane Doe is pleading it as a separate cause of action out of abundance of caution.

exploiting Jane Doe—and its course of action, and at least one or more of the conspirators, as alleged herein, committed at least one or more unlawful, over acts to further the object or course of action of the conspiracy.

245.    Jane Doe suffered injury and damages as a direct and proximate result of the wrongful act. The civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts, and omissions alleged, were a direct, producing, and proximate cause of the injuries and damages to Jane Doe. The civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts, and omissions alleged, were moreover a substantial factor in bringing about the injury and damages to Jane Doe. Without such civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts, and omissions alleged, the injury and damages would not have occurred. Moreover, a person of ordinary intelligence in Best Western's position would have foreseen that the damages alleged herein might result from the civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts, and omissions alleged.

246.    As co-conspirators, Best Western are jointly and severally with one another responsible for the injuries and damages suffered by Jane Doe.

247.    As a direct and proximate result of Best Western's wrongful acts and omissions, Jane Doe was trafficked and injured. Jane Doe suffered, and continues to suffer, severe injuries and damages.

### G.    SEVENTH CAUSE OF ACTION—GROSS NEGLIGENCE

248.    Jane Doe incorporates all other allegations.

249.    Best Western's  acts and omissions constitute gross neglect.

250.    Viewed objectively from the standpoint of Best Western at the time of the incidents, Best Western's acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Jane Doe.

251.    Best Western nevertheless evidenced conscious indifference to the rights, safety, or welfare of others, including Jane Doe.

252.    As a result of Best Western's gross neglect, Jane Doe was exposed to and did sustain serious and grievous personal injury.

253.    Each of Best Western's negligent acts and omissions, singularly or collectively, constituted gross negligence and proximately caused legal injuries to Jane Doe.

254.    Exemplary damages are warranted for Best Western's gross negligence.

## VIII.    EQUITABLE TOLLING

255.    Jane Doe hereby pleads that all applicable statutes of limitations, under both federal and state law, are tolled through equitable doctrines and/or theories including but not limited to the discovery rule and fraudulent concealment.[24]

256.    More specifically as to the Backpage Defendants, their true conduct was unknown to the unsuspecting public, including Jane Doe.  And it could not be discovered through the exercise of due diligence because the Defendants created a façade to mask the horrors from which they profited.

257.    The Backpage Defendants pretended (through at least 2018 when Ferrer admitted the truth in a plea deal) to be a legitimate website.  But that was a lie.  As discussed in Section IV, *supra,* the Backpage Defendants' deceptive conduct has been noted by multiple courts and Congress. Because the Backpage Defendants prevented the discovery of its tortious conduct, all applicable statutes of limitations should be tolled.

---

[24] *Bailey v. Glover*, 88 U.S. 342, 348 (1874)(holding that limitations periods in both suits at law and in equity are tolled until tortious conduct is discovered by the Plaintiff when the conduct "has been concealed, or is of such character as to conceal itself"); *Machules v. Dep't of Admin.*, 523 So. 2d 1132, 1133–34 (Fla. 1988)("The doctrine of equitable tolling was developed to permit under certain circumstances the filing of a lawsuit that otherwise would be barred by a limitations period.")(citing *Bailey v. Glover*).

## IX.   DAMAGES

258.    Best Western's acts and omissions, individually and collectively, caused Jane Doe to sustain legal damages.

259.    Jane Doe is entitled to be compensated for personal injuries and economic damages, including:

    a.   Actual damages;

    b.   Direct damages;

    c.   Incidental and consequential damages;

    d.   Mental anguish and emotional distress damages (until trial and in the future);

    e.   Lost earning capacity in the future;

    f.   Necessary medical expenses;

    g.   Physical pain and suffering;

    h.   Physical impairment;

    i.   Disfigurement;

    j.   Restitution;

    k.   Unjust enrichment;

    l.   Disgorgement;

    m.  Penalties; and

    n.   Other equitable relief that may be appropriate as the true extent of Best Western's conduct is discovered.

260.    Jane Doe is entitled to exemplary damages.

261.    Jane Doe is entitled to treble damages.

262.    Jane Doe is entitled to recover attorneys' fees and costs of court.

263.    Jane Doe is entitled to pre- and post-judgment interest at the maximum legal rates.

264.    A constructive trust should be imposed on Best Western and the Court should sequester any benefits or money wrongfully received by Best Western for the benefit of Jane Doe.

## X.    JURY TRIAL

265.    Jane Doe demands a jury trial on all issues.

## XI.    RELIEF SOUGHT

266.    Wherefore, Jane Doe respectfully requests judgment against the Backpage Defendants and Best Western for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees, and all other relief, at law or in equity, to which she may be justly entitled.


DATED this 6th day of February 2020.        Respectfully submitted,


ANNIE MCADAMS PC

By: /s/ Annie McAdams
        ANNIE MCADAMS, PC
        Annie McAdams
        State Bar No. 24051014
        1150 Bissonnet
        Houston, Texas 77005
        Telephone: (713) 785-6262
        Facsimile: (866) 713-6141
        annie@mcadamspc.com

        and

By: /s/ David E. Harris
        SICO HOELSCHER HARRIS LLP
        David E. Harris
        State Bar No. 24049273
        N.D. Tex. No. 712461
        Jeffrey H. Richter
        State Bar No. 24061614
        N.D. Tex. No. 1794395
        802 N. Carancahua, Ste. 900
        Corpus Christi, Texas 78401

Telephone: (361) 653-3300
Facsimile: (361) 653-3333
dharris@shhlaw.com

and

THE GALLAGHER LAW FIRM
Michael T. Gallagher
State Bar No. 07586000
N.D. Tex. No. 5395
Pamela McLemore
State Bar No. 24099711
2905 Sackett Street
Houston, Texas 77098
Telephone: (713) 222-8080
Facsimile: (713) 222-0066
mike@gld-law.com
pamm@gld-law.com

**ATTORNEYS FOR JANE DOE #15**